[Cite as *Tye v. Beausay*, 2020-Ohio-3746.]

## IN THE COURT OF APPEALS OF OHIO
### SECOND APPELLATE DISTRICT
### MONTGOMERY COUNTY

| | | |
|---|---|---|
| MATTHEW TYE, et al. | : | |
| | : | |
| Plaintiffs-Appellants | : | Appellate Case No. 28383 |
| | : | |
| v. | : | Trial Court Case No. 2015-CV-4852 |
| | : | |
| T. JEFFREY BEAUSAY, et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellees | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 17th day of July, 2020.

. . . . . . . . . . .

TERRY W. POSEY, JR., Atty. Reg. No. 0078292 and GARY W. GOTTSCHLICH, Atty. Reg. No. 0003760, 201 East Sixth Street, Dayton, Ohio 45402
and
NICHOLAS E. BUNCH, Atty. Reg. No. 0015008, 7587 Central Parke Boulevard, Mason, Ohio 45040
    Attorneys for Plaintiffs-Appellants

GREGORY B. FOLIANO, Atty. Reg. No. 0047239, 2075 Marble Cliff Office Park, Columbus, Ohio 43215
and
JOHN B. WELCH, Atty. Reg. No 0055337, 580 Lincoln Park Boulevard, Suite 222, Dayton, Ohio 45429
    Attorneys for Defendants-Appellees

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Plaintiffs-Appellants, Matthew Tye and Jodi-Anne Phares as guardian for Joshua Tye (collectively, "Appellants"), appeal from a summary judgment rendered in favor of Defendants-Appellees, T. Jeffrey Beausay and the Donahey Law Firm (collectively, "Appellees"). In support of their appeal in this legal malpractice action, Appellants claim that the trial court erred in granting summary judgment on the issues of proximate cause and respondeat superior.

{¶ 2} For the reasons discussed more fully below, we conclude that the trial court did not err in granting summary judgment on Matthew Tye's claim, because Matthew admitted that even if he had been properly informed, he would still have signed a release of his claims in the underlying medical malpractice action. However, the court did err in granting summary judgment against Phares, who represented the interests of Joshua Tye, a physically and intellectually disabled person. While Phares stated, in response to a speculative question, that she did not know what she would have done if properly informed of Joshua's claim, the record contained substantial evidence indicating that she would not have agreed to waive his claim. Therefore, a genuine issue of material fact existed as to whether Beausay's actions were the proximate cause of any harm to Joshua, and the court erred in granting summary judgment on Joshua's claim.

{¶ 3} We further conclude that the trial court did not err in rendering summary judgment in favor of the Donahey Law Firm based on respondeat superior. There was no evidence that the law firm controlled the actions of the attorney who obtained releases from Matthew and Joshua Tye without properly notifying them about their claims. The record also contains no evidence of apparent authority. Accordingly, the trial court's judgment will be affirmed in part, reversed in part, and remanded for further proceedings

## I. Facts and Course of Proceedings

**{¶ 4}** This is the second time this case has been before us. The first appeal involved a summary judgment granted on whether an attorney-client relationship existed between the Tye brothers and Beausay. *See Tye v. Beausay*, 2017-Ohio-7943, 98 N.E.3d 970 (2d Dist.) ("*Tye I*"). The facts set forth in that case were as follows:

> The present litigation stems from a 2010 medical-malpractice lawsuit filed by the Tyes' father, Scott Tye, and their stepmother, Barbara Tye. Scott and Barbara Tye were represented by attorney Beausay and the Donahey Law Firm in the lawsuit, which alleged negligence by various doctors in failing to diagnose and treat a spinal epidural abscess that resulted in Scott Tye's paralysis. Matthew and Joshua, Scott Tye's adult sons, without their knowledge or assent, were also named by Beausay as plaintiffs in the medical-malpractice lawsuit where one or more claims were asserted on their behalf. As part of a settlement process, Beausay mediated and dismissed the lawsuit, which included the claims he asserted on behalf of the Tye brothers, without ever contacting or advising them in any way. Prior to distribution of the settlement proceeds, Scott Tye informed his sons that they were required to sign releases. At the time, the Tye brothers were young adults, and they did not live with Scott and Barbara. The Tye brothers signed the releases at their father's request. The releases precluded them from pursuing any present or future claims against the medical-malpractice defendants related to their father's medical

treatment and care. Despite the settlement, the Tye brothers never received any of the compensation, which appears to have gone to their father, as none of it was segregated or earmarked for them. The Tye brothers did not discover that Beausay had involved them in the case until after their father's death, which occurred just weeks after the final claims were dismissed with prejudice and the last releases were signed. Appellants alleged the death was related to the medical care their father received.

Upon discovering that Beausay had involved them in the medical-malpractice case without their knowledge, the Tye brothers filed the present lawsuit against Beausay and the Donahey Law Firm. In an amended complaint, they asserted a legal-malpractice claim as well as alternative claims for bad faith, conversion, malicious conduct, privity, estoppel, third-party beneficiaries, and respondeat superior. The trial court subsequently sustained in part and overruled in part a Civ.R. 12(B)(6) motion filed by Beausay and his law firm. It found that the Tye brothers' complaint sufficiently stated a claim for legal malpractice based on the existence of an attorney-client relationship with Beausay. Therefore, the trial court refused to dismiss the legal-malpractice claim. It concluded, however, that the alternative claims, regardless of how they were pled, were in substance legal-malpractice claims and were subsumed by that claim. Consequently, the trial court sustained the motion to dismiss with regard to the seven alternative claims.

Beausay and the law firm later moved for summary judgment on the remaining legal-malpractice claim. The grounds for the motion were (1) that no attorney-client relationship existed between the Tye brothers and Beausay and (2) that the Tye brothers did not sustain any harm proximately caused by anything Beausay did. The Tye brothers opposed the motion, arguing (1) that a "malice" substitute for an attorney-client relationship existed and (2) that, at a minimum, genuine issues of material fact existed as to whether Beausay's actions had caused them harm.

In a December 22, 2016 ruling, the trial court sustained the summary-judgment motion. It concluded that no attorney-client relationship existed between the Tye brothers and Beausay. It also concluded that the "malice" substitute for an attorney-client relationship did not apply.

*Tye I*, 2017-Ohio-7943, 98 N.E.3d 970, at ¶ 3-6.

{¶ 5} On appeal, we concluded that there was no express or implied attorney-client relationship. *Id.* at ¶ 10. We did reverse the summary judgment decision, however, based on a malice substitute for an attorney-client relationship. In this regard, we said that "[e]ven if we did not conclude that filing, pursuing, mediating, settling and dismissing a lawsuit is collectively sufficient extra-legal activity to constitute an exception to the attorney-client relationship, viewing the evidence and all reasonable inferences in a light most favorable to the Tye brothers, we find a genuine issue of material fact as to whether Beausay acted with 'malice' (i.e., extra-legal activity) toward them * * *." *Id.* at ¶ 18, citing *Omega Riggers & Erectors, Inc. v. Koverman*, 2016-Ohio-2961, 65 N.E.3d 210 (2d Dist.),

{¶ 6} We also concluded that genuine issues of material fact existed concerning

whether the Tyes had suffered harm.  We noted that:

> Although Beausay asserts that the Tye brothers suffered no harm as a result of his actions, we believe there is a genuine issue that a trier of fact reasonably might conclude otherwise.  The Tye brothers' claims presumably had some settlement value.  Otherwise, there would be no purpose to include them in the lawsuit and the medical-malpractice defendants would not have required their signatures on the releases.  Beausay certainly had no duty to preserve the Tye brothers' claims by bringing them into the lawsuit without their knowledge.  Having elected to do so, however, a trier of fact reasonably could find that he then consciously disregarded their rights as unknowing plaintiffs in the lawsuit by pursuing a negotiated release-and-settlement process that largely ignored them (other than obtaining their signatures on unexplained releases) and provided them nothing, thereby resulting in substantial financial harm.  On the other hand, a trier of fact also potentially might agree with Beausay and the Donahey Law Firm and conclude that the Tye brothers would have consented to the settlement anyway and suffered no harm.  For summary-judgment purposes, however, we must construe the facts and all reasonable inferences in favor of the Tye brothers.

(Footnote omitted.) *Id.* at ¶ 21.

{¶ 7} After we reversed the judgment and remanded the case, a trial was ultimately set for April 15, 2019.  In the meantime, however, Appellees filed a motion for summary judgment on January 25, 2019, contending that the Tyes did not suffer a compensable

loss based on the medical malpractice. The same day, the Donahey Law Firm also filed a motion for summary judgment based on the fact that it could not be held liable under respondeat superior because Beausay was not an employee of the firm.

{¶ 8} On February 1, 2019, Appellees filed a third summary judgment motion, contending that Phares could not prove that any harm was caused to Joshua Tye. According to this motion, Joshua had been incompetent his entire life due to a developmental delay and cerebral palsy. Motion for Summary Judgment on Joshua Tye's Claims, p. 3-4. Consequently, because Joshua had never been competent, the release of claims he signed was invalid, and he had given up nothing by signing it. *Id.* at p. 7-9.

{¶ 9} This was followed by yet another summary judgment motion by Appellees on February 15, 2019. The motion was based on the contention that the Tyes could not prove that they would have received any of the money from their father's settlement, and that, therefore, no proximate cause existed. Motion for Summary Judgment on Proximate Cause, p. 4-5.

{¶ 10} On February 25. 2019, Appellants filed two responses to the pending summary judgment motions. In one memorandum, Appellants argued that the motion for summary judgment on failure to prove consortium was simply an attempt to circumvent the trial court's previous decision that the Tyes were not required to prove a "case within a case." Memorandum in Opposition to Summary Judgment (No Compensable Injury) at p. 7, citing *Vahila v. Hall*, 77 Ohio St.3d 421, 674 N.E.2d 1164 (1997). The other memorandum addressed the arguments about the claim of Phares as guardian for Joshua and proximate cause. Memorandum in Opposition to Summary Judgment

(Proximate Cause) at p. 1. In response to the proximate cause issue, Appellants noted that if a dispute had arisen about the proceedings in the medical malpractice case, the settling parties could have deposited the money with the court and allowed the court to decide what amount each party should receive. In addition, Appellants stressed that Matthew's and Joshua's names were on the settlement check in the medical malpractice litigation. *Id.* at p. 7-9 and Ex. C attached to the memorandum.

{¶ 11} Subsequently, on March 4, 2019, Appellees filed three separate memoranda in support of their motions for summary judgment. On March 21, 2019, Appellees then filed a supplemental memorandum on summary judgment concerning proximate cause. For the first time, Appellees raised the issue of whether there was a genuine issue of material fact that the Tyes suffered harm, because they would have consented to the settlement anyway. *Id.* at p. 1. In support of this motion, Appellees relied on the "updated" depositions of Matthew and Phares.

{¶ 12} On April 8, 2019, the trial court granted the Donahey Law Firm's motion for summary judgment on the issue of respondeat superior. The court concluded that Beausay was an independent contractor and that Donahey did not have the ability to control the manner or means of his work. *See* Order on Respondeat Superior, p. 3. The same day, the trial court also granted summary judgment to Appellees on the issue of proximate cause. *See* Order on Proximate Cause. This timely appeal followed.

## II. Proximate Cause

{¶ 13} Appellants' First Assignment of Error states:

The Trial Court Erred in Granting Summary Judgment on the Basis

of Proximate Cause.

{¶ 14} Under this assignment of error, the Tyes contend that the trial court erred in granting summary judgment on the issue of proximate cause. As support, they contend that the testimony of Phares and Matthew about what they would have done if they had known the true state of affairs was susceptible to more than one interpretation. They also stress that no evidence was presented about what Joshua would have done if he had known.

{¶ 15} In its decision on proximate cause, the trial court concluded that Matthew Tye could not prove that Beausay's conduct, while improper, proximately caused harm to him. This was based on Matthew's admission that he would have signed the release even if its effect on his own claim had been more fully explained to him. With respect to Joshua's claim, the court found a lack of proximate cause due to the inability of Joshua's guardian, Phares, to say what she would have done if she had known about the claim.

{¶ 16} "A trial court may grant a moving party summary judgment pursuant to Civ.R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." *Smith v. Five Rivers MetroParks*, 134 Ohio App.3d 754, 760, 732 N.E.2d 422 (2d Dist.1999), citing *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 375 N.E.2d 46 (1978). "We review decisions granting summary judgment de novo, which means that we apply the same standards as the trial court." (Citations omitted.) *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.). Consequently,

appellate courts do not defer to trial courts during summary judgment review. *Powell v. Rion*, 2012-Ohio-2665, 972 N.E.2d 159, ¶ 6 (2d Dist.), citing *Brown v. Scioto Cty. Bd. of Commrs.*, 87 Ohio App.3d 704, 711, 622 N.E.2d 1153 (4th Dist.1993).

{¶ 17} "To establish a cause of action for legal malpractice based on negligent representation, a plaintiff must show (1) that the attorney owed a duty or obligation to the plaintiff, (2) that there was a breach of that duty or obligation and that the attorney failed to conform to the standard required by law, and (3) that there is a causal connection between the conduct complained of and the resulting damage or loss." *Vahila*, 77 Ohio St.3d 421, 674 N.E.2d 1164, at syllabus.

{¶ 18} In *Vahila*, the supreme court stated that the analysis of causation in legal malpractice cases " 'should be made in accordance with the tort law relating to proximate cause' and 'should focus on the facts of the particular case.' " *Id*. at 462, quoting *Krahn v. Kinney*, 43 Ohio St.3d 103, 106, 538 N.E.2d 1058 (1989). In some situations, like "[w]hen a plaintiff is claiming he would have been better off had the underlying matter been tried rather than settled, the standard for proving causation requires more than just some evidence of the merits of the underlying suit." *Environmental Network Corp. v. Goodman Weiss Miller, L.L.P.*, 119 Ohio St.3d 209, 2008-Ohio-3833, 893 N.E.2d 173, ¶ 21 (distinguishing *Vahila*).

{¶ 19} This is not such a case, and the rule in *Vahila* applies. "The rule of proximate cause ' "requires that the injury sustained shall be the natural and probable consequence of the negligence alleged; that is, such consequence as under the surrounding circumstances of the particular case might, and should have been foreseen or anticipated by the wrongdoer as likely to follow his negligent act." ' " *Jeffers v. Olexo*,

43 Ohio St.3d 140, 143, 539 N.E.2d 614 (1989), quoting *Ross v. Nutt*, 177 Ohio St. 113, 114, 203 N.E.2d 118 (1964). (Other citation omitted.) "Causation is established using the 'but for' test. * * * A defendant's conduct is the cause of the harm if the harm would not have occurred but for the defendant's act or failure to act." *Rieger v. Giant Eagle, Inc.*, 157 Ohio St.3d 512, 2019-Ohio-3745, 138 N.E.3d 1121, ¶ 12. "There must be evidence of causation before the plaintiff's negligence claim may be submitted to the jury." *Id.*

{¶ 20} In the case before us, Appellees and the trial court focused on the following comments in *Tye I*:

Although Beausay asserts that the Tye brothers suffered no harm as a result of his actions, we believe there is a genuine issue that a trier of fact reasonably might conclude otherwise. The Tye brothers' claims presumably had some settlement value. Otherwise, there would be no purpose to include them in the lawsuit and the medical-malpractice defendants would not have required their signatures on the releases. Beausay certainly had no duty to preserve the Tye brothers' claims by bringing them into the lawsuit without their knowledge. Having elected to do so, however, a trier of fact reasonably could find that he then consciously disregarded their rights as unknowing plaintiffs in the lawsuit by pursuing a negotiated release-and-settlement process that largely ignored them (other than obtaining their signatures on unexplained releases) and provided them nothing, thereby resulting in substantial financial harm. On the other hand, a trier of fact also potentially might agree with Beausay and the Donahey

Law Firm and conclude that the Tye brothers would have consented to the settlement anyway and suffered no harm. For summary-judgment purposes, however, we must construe the facts and all reasonable inferences in favor of the Tye brothers.

*Tye I*, 2017-Ohio-7943, 98 N.E.3d 970, at ¶ 21.

{¶ 21} After the case was remanded, Appellees took additional depositions of Matthew Tye and Phares, Joshua's guardian. We will consider the facts relating to these claims separately.

### A. Matthew Tye

{¶ 22} After reviewing the deposition of Matthew Tye, we agree with the trial court that summary judgment was warranted on his claims. During his 2019 deposition, Matthew stated that he knew that his father had retained a Columbus, Ohio, lawyer to pursue a medical malpractice action. Matthew Tye Depo. (Vol. 2) p. 112. Matthew acknowledged that when he signed the release, he knew what a lawsuit was, knew what a settlement was, and knew that he was not going to sue the doctors involved in the medical malpractice case. *Id.* at p. 114-115. However, he also stated that when he signed the release, he did not understand the full extent of what he was signing or the full extent of his legal rights. *Id.* at p. 116.

{¶ 23} Later in the deposition, Matthew responded to a series of hypothetical questions about what he would have done if he had been informed by Beausay that he was a plaintiff in the malpractice suit and had a potential consortium claim. Matthew initially stated that he would seek neutral counsel and follow counsel's advice. *Id.* at p.

123-126.    The following exchange then occurred.

Q.  Okay.  All right.  So say the lawyer says to you that you can hold out and not sign the releases, but that's going to mean Dad, your father, is not going to get his settlement and potentially have to try this case, what would you do then?

* * *

THE WITNESS:   I'll be honest with you.   I would – the whole picture is I want my dad – I wanted my dad and I still want my dad, if he was alive, to have said money.   And I would look at my said lawyer – let's just say Cassandra [Rice] is my said lawyer.   I would say I know I'm going to give this up.   It's for my father.   Do you think maybe we should just after – if I sign, do you think we should then just pursue something afterwards?   And then hypothetically, maybe she says yes or she says no.   I would say ok, in the end, it's a medical malpractice for my father, so I would sign. Because in the end, it's about his care.

So I know yes, I'm going to give up my rights.   Maybe I'll get some money.   Nobody knows that amount.   I would sign.   Then I would still have my counsel, and I would say, you know I'm going to sign, it's my personal choice, but what's your opinion before I do it – and I would do it. And then, hey, can we work something out. Jeff [Beausay]?   It's nice meeting you.   Can we work something out now.

Matthew Tye Depo. (Vol. 2) p. 126-127.

{¶ 24} Subsequently, this exchange occurred:

Q. * * * One of the things you just told us is that this was your Dad's medical negligence case, correct?

A. That's correct.

Q. And you would not have done anything that would interfere with his rights of his settlement, correct?

A. I would not, no.

Q. So if it came down to giving up your rights to money to get him a settlement, you would have agreed to settle the case without getting anything?

A. I would agree, and I would still pursue afterwards between a consortium of lawyers, my father, you know, all of that, we would keep working. I mean, I still, after the case was settled, I still saw him frequently until his passing. So we had plenty of time and we had plenty of time to speak.

Q. So let's kind of cover that. So you have this discussion with your lawyer and you say hey, I'm not going to interfere with my dad's settlement. Can we do something after so I can get some money. And your lawyer says look, once you sign this, that money belongs to your dad and it will be up to your dad to give it to him – to you or not, what would you do then?

A. Like I said, I would still sign –

Q. Okay.

A. – based on my legal counsel even saying that.

Matthew Tye Depo. (Vol. 2) p. 128-129.

{¶ 25} Finally, this exchange took place:

Q. All right. So now let's move forward. And I guess what I'm getting to is the ultimate question is even knowing all the money is going to your dad and you had a claim which was potentially worth some money, you would still sign the release?

MS. RICE: Objection. Asked and answered.

THE WITNESS: The money was for my father, Scott Tye. It was not for myself. Yes, I would sign.

*Id.* at p. 130-131.

{¶ 26} In support of the impropriety of summary judgment on both Matthew's and Joshua's claims, Appellants contend that whether a party would have changed course in hindsight is a credibility issue for the jury. For this purpose, they cite *In re Levaquin Products Liab. Litigation*, 726 F.Supp.2d 1025, 1036 (D.Minn.2010), and *Provenzano v. Integrated Genetics*, 22 F.Supp.2d 406, 408 (D.N.J.1998). Neither case is particularly helpful here.

{¶ 27} In *Levaquin*, manufacturers were sued based on administration of an antibiotic that was accompanied by warnings about potential tendon toxicity. The plaintiff sued because he suffered a ruptured Achilles tendon after being prescribed the drug. *Levaquin* at 1026-1027.

{¶ 28} The motion being considered by the court was the defendants' motion for summary judgment based on the learned intermediary doctrine. According to the court, this doctrine "involves an examination of whether the prescribing physician was

independently informed of the relevant risks, and whether the prescribing physician would have taken the same course of action even if the defendants had provided additional warnings. * * * If a defendant properly establishes the facts necessary to support the learned intermediary defense, a patient will be unable to show that the defendant's failure to warn the prescribing physician is a proximate cause of the patient's injury. * * * This doctrine therefore requires the Court to conduct a careful examination of the prescribing physician's experience, knowledge, and state of mind when making the decision to prescribe the particular drug at issue." *Id.* at 1027-1028.

{¶ 29} After considering the prescribing doctor's testimony in detail, the court concluded that summary judgment was not appropriate. As relevant here, the doctor testified during his deposition that, "even if he had known in 2003 about studies indicating that Levaquin was twice as toxic as Ciprofloxacin, such knowledge would not have potentially affected the prescription that he gave" the plaintiff. He also testified that "even if he had known that Levaquin was reported to be ten times as tendon toxic as non-Fluoroquinolones, such knowledge would not have changed what he prescribed." *Id.* at 1031.

{¶ 30} Although the defendants claimed this entitled them to summary judgment regarding adequacy of the warnings, the district court disagreed, stating that "after reviewing Dr. Butner's deposition transcript, the Court finds that Dr. Butner's testimony regarding what he would have done if he had received a more complete warning of the risks of tendon toxicity presents an issue of credibility that is within the province of the trier of fact." *Id.* at 1036.

{¶ 31} The other cited case, *Provenzano*, 22 F.Supp.2d 406, involved a wrongful

birth claim brought against two genetics companies, a doctor, and some John Doe medical providers, based on their alleged negligent analysis and diagnosis of amniocentesis samples during a pregnancy that resulted in twins. *Id.* at 408. According to the complaint, "Defendants' negligence deprived Plaintiffs of the necessary information to make an informed decision as to whether to opt for a selective reduction – a procedure in which one fetus of several may be terminated. Plaintiffs seek damages for emotional distress and extraordinary medical expenses attributable to Tiffany's birth defects * * *." *Id.*

{¶ 32} The mother in *Provenzano* testified that she was not sure that she would have chosen to abort one fetus and keep the other if she had known of the birth defect (which resulted in the child's death less than a year after birth). *Id.* at 410. While the father first testified that he would not have chosen selective reduction because he wanted both children, he later filed a certification stating that he would have chosen the reduction and had only testified to the contrary because he had gone for 21 hours without sleep before he was deposed. *Id.*

{¶ 33} In contending that summary judgment based on lack of causation should be granted, the defendants argued that the mother's "deposition testimony did not conclusively establish that she would have terminated fetus B but for Defendants' failure to inform her and her husband of the accurate test results." *Id.* at 415. The court disagreed, stating that "[w]hile wrongful life claims require a but for proximate cause test, the Supreme Court of New Jersey has never established such a high standard for a wrongful birth claim, as Defendants allege, nor can this Court predict that it would do so." *Id.* The court commented that while the test for wrongful life is a "subjective" standard,

the test for "wrongful birth" is objective.

**{¶ 34}** The *Levaquin* and *Provenzano* cases involved medical claims, and *Provenzano*, in particular, involved the medical malpractice doctrine of informed consent. Like New Jersey, Ohio has recognized the informed consent doctrine in medical malpractice cases. At common law, Ohio recognized a battery cause of action for failure to provide informed consent before performing a medical procedure. Later, however, courts recognized that this was essentially a matter of professional conduct, and negligence displaced battery as the cause of action. *White v. Leimbach*, 131 Ohio St.3d 21, 2011-Ohio-6238, 959 N.E.2d 1033, ¶ 23.

**{¶ 35}** The tort of lack of informed consent, as established in Ohio, contains the following requirements:

> (a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;
>
> (b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and
>
> (c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy.

*Nickell v. Gonzalez*, 17 Ohio St.3d 136, 477 N.E.2d 1145 (1985), syllabus.

**{¶ 36}** After outlining these standards, *Nickell* considered the trial court's issuance of a judgment notwithstanding the verdict and whether there was a sufficient basis for the

jury's verdict for the physician under the reasonable person standard. *Id.* at 139. The court then commented that, "[i]n situations involving informed consent, a "patient's hindsight (i.e., testimony as to her hypothetical response to the undisclosed information), while relevant, is not determinative." *Id.*, citing *Sard v. Hardy*, 281 Md. 432, 440, 379 A.2d 1014 (1977).

{¶ 37} Subsequently, in *White*, the Supreme Court of Ohio noted that *Nickell* had not fully explained the needed analysis. *White,* 131 Ohio St.3d 21, 2011-Ohio-6238, 959 N.E.2d 1033, at ¶ 30. Concerning the issue of proximate cause, the court said that "expert medical testimony is not necessary to establish what a reasonable person in the position of a patient would have done had the material risks and dangers been disclosed prior to therapy. The third element of *Nickell*, that a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers been disclosed, is a matter that falls within the comprehension of a layman. Thus, consistent with our opinion in *Nickell*, it is for the trier of fact to determine whether a reasonable person in the plaintiff's position would have attached significance to the undisclosed material risks and dangers inherently and potentially involved with the procedure and would have decided against the procedure." *Id.* at ¶ 40.

{¶ 38} Thus, like *Provenzano*, Ohio recognizes the informed consent doctrine in medical malpractice cases and applies an objective (or reasonable patient) standard to assess causation. Also like *Provenzano*, Ohio recognizes a cause of action for wrongful birth. However, in contrast to *Provenzano* (a New Jersey case), Ohio does not permit actions for wrongful life. *See Schirmer v. Mt. Auburn Obstetrics & Gynecologic Assoc., Inc.*, 108 Ohio St.3d 494, 2006-Ohio-942, 844 N.E.2d 1160, syllabus.

{¶ 39} In *Schirmer*, the Supreme Court of Ohio commented that overreliance on the terms wrongful birth and wrongful life complicates the matter; instead, the proper analysis would be to apply traditional standards for medical malpractice claims. In this vein, the court noted that "[l]iability based on the alleged negligence of a medical professional requires proof of four elements: (1) a duty running from the defendant to the plaintiff, (2) a breach of that duty by the defendant, (3) damages suffered by the plaintiff, and (4) a proximate causal relationship between the breach of duty and the damages." *Id.* at ¶ 13. As to causation, the court stated that its holding "merely recognizes that medical negligence during prenatal care that affects the parents' ability to decide whether to continue the pregnancy may be actionable." *Id.* at ¶ 30.

{¶ 40} In an opinion concurring with the syllabus and judgment only, Justice Moyer further addressed the causation issue:

Causation requires a factual nexus between the breach and injury (i.e., actual cause) and a significant degree of connectedness that justifies imposing liability (i.e., proximate cause). * * * Mrs. Schirmer alleges that defendants' breach of duty [to provide adequate genetic counseling] denied her the opportunity to make an informed decision whether to terminate her pregnancy. Thus, instead of asking whether the defendants' negligence proximately caused the child's defects, which it clearly did not, we must ask whether the defendants' negligent genetic testing caused the mother to make an ill-informed decision, and, if it did, what damages may result from the breach.

Helen Schirmer clearly would not have been deprived of her right to

make a fully informed reproductive decision but for the negligent genetic testing. The Schirmers sought the defendants' services expressly to determine whether their child would be born with a specific genetic abnormality. Furthermore, because the breach was the sole reason that Helen Schirmer was not able to make a fully informed decision, the negligence was directly connected to that injury. Thus, the facts as alleged demonstrate that the breach, the failure to correctly diagnose a preexisting genetic defect, proximately caused the injury, the loss of the opportunity to make an informed decision whether to terminate the pregnancy.

(Emphasis added.) *Id.* at ¶ 40-42 (Moyer, C.J., concurring in judgment and syllabus only). The parents' subjective position was not at issue in *Schirmer,* as they said they would have terminated the pregnancy if they had been informed. *Id.* at ¶ 6.

{¶ 41} Thus, like the cases Appellants cite, Ohio does recognize an objective standard in informed consent cases, at least in the area of medical malpractice. While Appellants have not specifically asked that we adopt an objective standard and have phrased their argument in terms of credibility issues, the cases they cite involve medical claims, whether in the context of drugs and the learned intermediary or in the context of informed consent.[1] The question does arise whether an objective standard, with even some subjective element, as mentioned in *Nickell* and *White*, would properly apply in legal malpractice cases that involve informed consent.

{¶ 42} We have not found Ohio authority extending an objective, "reasonable

---

[1] Ohio also uses the learned intermediary doctrine as well, by statute and under common law. *See* R.C. 2307.76(C) and *Vaccariello v. Smith & Nephew Richards, Inc.*, 94 Ohio St.3d 380, 385-386, 763 N.E.2d 160 (2002).

person" standard to legal malpractice cases where the contention is that the lawyer took actions without properly informing a client. The authority outside Ohio is also virtually non-existent.

{¶ 43} In *Conklin v. Hannoch Weisman*, 145 N.J. 395, 678 A.2d 1060 (1996), the court of appeals used both a subjective and objective standard to evaluate legal malpractice claims, but the New Jersey Supreme Court disagreed. In that case, a law firm represented a family in the sale of its farm to developers and let the family sign paperwork subordinating its mortgage lien for the remainder of the purchase price to that of another lender, without properly informing the family of the consequences of doing so. *Id.* at 401-402. A few years later, the buyers defaulted, and the family was unable to recover any of the remaining purchase price due to the buyer's bankruptcy and the existence of the other mortgage. *Id.*

{¶ 44} The family then sued its attorney for legal malpractice, but was unsuccessful after a jury trial. However, the trial court concluded that it had given the jury inconsistent instructions on intervening causation and granted a new trial. *Id.* On appeal, the appellate court agreed that a new trial was warranted, but disagreed about the scope of the new trial. *Id.* at 405. Specifically, the court said that:

The Appellate Division first instructed the court on retrial to exclude proximate cause from its charge to the jury (except as a factor in assessing damages if the jury found defendant to be liable) and instead to employ an objective cause-in-fact analysis similar to that used in medical malpractice "informed consent" cases, in which a court asks the jury to decide whether a prudent patient would have declined to undergo the medical treatment if

adequately informed of its risks. Under that rationale, when an attorney provides inadequate or inaccurate advice, the jury should be asked whether a prudent client would have declined to enter into the transaction if adequately informed of its risks.

*Id.* at 406.

{¶ 45} The court of appeals had also deemed a "limited" subjective standard to apply "because, based on uncontested evidence of statements of certain plaintiffs to defendants prior to the sale of the [family's] land, a jury could determine without relying solely on uncorroborated hindsight that plaintiffs would not have sold their property if advised of the risks of subordination." *Id.* at 407.

{¶ 46} On further appeal, the New Jersey Supreme Court also agreed that a new trial was needed, due to the confusing jury instructions. However, the court disagreed with the scope of the new trial. First, while the jury had found the defendants at fault, the general verdict was imprecise. *Id.* at 411. In addition, the jury would not be allowed to consider the issue of the family's contributory negligence, because "when the duty of the professional encompasses the protection of the client or patient from self-inflicted harm, the infliction of that harm is not to be regarded as contributory negligence on the part of the client." *Id.* at 412.

{¶ 47} The final issue related to the negligence standard to be applied in cases involving concurrent causes of harm (in *Conklin,* these were the buyer's default and bankruptcy, and the law firm's failure to properly advise). *Id.* at 413. Observing that the appellate court's standards were drawn from the medical malpractice arena, the supreme court noted some distinctions as a basis for refusing to adopt them. Concerning these

distinctions, the court remarked that "in many instances the business client, unlike the medical patient, is not sick when the client consults an attorney. The business client is often motivated to enter into a legal transaction for many more reasons than a medical patient and may be at no risk at all at the inception of the transaction. Moreover, while most patients will not appreciate the risks of medical treatments absent an explanation by a doctor, many clients may understand as well as their attorney, if not better, the risks of a commercial business transaction." *Id.*

{¶ 48} Regarding the objective prong, the court commented that:

The objective theory of informed consent, under which the jury would be asked to consider whether a reasonably prudent client would have entered into a business transaction if adequately informed of its attendant risks, fails to reflect the many highly subjective, personal, financial and strategic concerns that underlay most legal decisions and that are not present in the majority of medical decisions. A majority of medical patients are sick and consult a doctor for a single purpose – to get well. The patients usually bring little or no personal knowledge to the evaluation of the risks associated with their recovery.

Without any insight into the make-up and needs of the legal malpractice plaintiff, expert testimony regarding what a reasonably prudent client would have done under similar circumstances in weighing the risks and complications of complex commercial business transactions appears of dubious value to the trier of fact. Would a client wish not to be presented as a prudent person? * * * Clients such as * * * Harry Helmsley might view

such matters differently than family farmers or business people or real estate developers. Defendants' expert acknowledged that the measure of the attorney's advice "depends on the expertise of the individual [client] involved."

*Conklin*, 145 N.J. at 414-415, 678 A.2d 1060.

{¶ 49} The supreme court went on to note that even though the appellate court had included a requirement of some corroboration, which "reduces the potential for evaluations of attorney malpractice based on hindsight," there was no persuasive reason to introduce a subjective standard. The court followed this up by stressing that:

That is not to say that a legal malpractice claimant's testimony concerning whether he or she would have entered into a transaction, if adequately informed of its risks, is irrelevant. A client's attitude about risk is a part of that client and is a component of proximate cause. *Compare Profit Sharing Trust v. Lampf,* 267 N.J.Super. 174, 193, 630 A.2d 1191 (Law Div.1993) (holding that assumed legal malpractice was proximate cause of damages when plaintiffs specifically testified that had they been adequately or accurately informed of risks of commercial business transaction they would not have entered into transaction) with *Lamb v. Barbour*, supra, 188 N.J.Super. [6] at 12–13, 455 A.2d 1122 [(N.J. Super. Ct. App. Div.1982)] (holding that assumed legal malpractice was not proximately connected to claim of damages when plaintiff offered no testimony "as to any circumstances reasonably to be hypothesized under which [plaintiff] could have been dissuaded from completing the transaction.").

*Id.* at 416.

{¶ 50} The New Jersey Supreme Court then stated that, instead of incorporating informed consent standards from medical cases, it would continue to apply "the usual principles of negligence" as used by most jurisdictions for legal malpractice, that is, " '(1) the existence of an attorney-client relationship creating a duty of care upon the attorney; (2) the breach of that duty; and (3) proximate causation.' " *Id.*, quoting *Lovett v. Estate of Lovett*, 250 N.J.Super. 79, 87, 593 A.2d 382 (Ch.Div.1991).

{¶ 51} After extensively discussing proximate cause – and because the case before it involved concurrent causes – the court rejected the traditional test for proximate cause because the lender's actions did not either set in motion or increase the risk of the buyer's bankruptcy. *Id.* at 416-420. Instead, the court used a "substantial factor" test, in which "a court might instruct the jury to consider whether a reasonably competent transactional lawyer would have advised the clients of the economic risks that they took and whether the lack of the benefit of that advice was a substantial factor in causing them harm." *Id.* at 419. This would not apply to the case before us, because there are no concurrent causes.

{¶ 52} Another case that we have discovered is an Illinois appellate case that involved failure to inform a client of a proposed settlement. *First Natl. Bank of LaGrange v. Lowrey*, 375 Ill.App.3d 181, 872 N.E.2d 447 (Ill.App.2007). The court did not specifically discuss "objective" or "subjective" standards, but it did comment that "the jury in this case found that a reasonable person would have accepted the settlement, and [minor plaintiff's mother's] testimony established she would have accepted the settlement given her goals in filing the lawsuit and the risks of going to trial. [She] specifically

testified that her motivation was '[n]ot the money,' but rather to 'go after the doctor so he couldn't do it to another baby,' and that going after a guilty verdict at trial would not have achieved this goal." *Id.* at 205-06. Thus, *Lowery* appears to have used both objective and subjective criteria, without specifically indicating why.[2]

{¶ 53} The only other remotely pertinent case that we have found is *Estate of West v. Domina Law Group, PC, LLO*, No. 1:16-cv-30-HCA, 2018 WL 3454904 (S.D. Iowa 2018). In this case, an estate sued a law firm based on alleged incomplete or improper legal advice it had given the decedent about resolving a corporate deadlock. The advice caused the decedent to dissolve his corporation and allegedly receive substantially less than he would have received if the lawyers had correctly informed him of his options. *Id.* at *1. In considering cross-motions for summary judgment, a magistrate judge stated that the parties and the court both agreed that the standard for deciding informed consent was objective. *Id.* at *10. In a footnote, the magistrate judge further stated that "[t]he Iowa Supreme Court uses an objective causation standard when it analyzes informed consent in a medical context. * * * The Court finds that, in the context of an informed consent legal malpractice case, an objective standard is appropriate as well." *Id.* at *10, fn. 11. Beyond this statement, there was no analysis.

{¶ 54} Having reviewed these authorities, or rather, the lack of authority, we cannot find a basis for incorporating the medical malpractice standards for informed consent,

---

[2] Because the underlying medical malpractice action involved a minor child and the trial court would have had to approve the settlement in that case, the court of appeals concluded that this was part of the proof in the legal malpractice action. As a result, whether the trial court would have approved the settlement was a question for the jury. *Lowery* at 200 (affirming the one million dollar jury award for the child in the legal malpractice action).

which would allow consideration of what a reasonable person would do, as opposed to what Matthew Tye said he would do. There may be arguments for using an objective standard as well as some subjective analysis, but we have not been able to find such authority.

{¶ 55} Matthew's candor and concern for his father was evident and refreshing. Unfortunately, it was fatal to his claims. If, as Matthew said, he would have signed the release even if he had been made aware of the facts and had known he was giving up all rights, there was no causal link between Beausay's improper actions and any harm to Matthew that occurred.

{¶ 56} Even in a medical malpractice case where the informed consent doctrine applied, the court of appeals concluded that a patient's subjective statement precluded her recovery. In *Misel v. Khanna*, 7th Dist. Mahoning No. 86 C.A. 122, 1987 WL 13257 (June 23, 1987), a plaintiff-patient sued her doctor because he failed to inform her about the option of using a "halo brace" as an alternative to surgery. *Id*. at *1. During arbitration, the plaintiff testified that if she had known about the halo procedure, she thought she " 'would have had to elect the surgery.' " *Id*. at *2. The trial court later granted summary judgment in the doctor's favor. *Id*.

{¶ 57} When the plaintiff appealed, the court of appeals affirmed. While the Ohio Supreme Court's decision in *Nickell,* 17 Ohio St.3d 136, 477 N.E.2d 1145 (relying on *Sard,* 281 Md. 432, 440, 379 A.2d 1014) had previously said that a plaintiff's hypothetical response was not determinative, the court of appeals concluded in *Misel* that a different approach was warranted, based on the circumstances presented. Specifically, the court explained:

In the *Sard* case the Court of Appeals for Maryland did rule that a patient's hindsight should not be determinative, however, an explanation of the reason for such ruling is relevant to this case. The Maryland[ ] court ruled that the test as to what a patient would have done should be an objective test – what a reasonable person in the patient's position would have done had he been fully informed. The Maryland court went on to reason that the rationale commonly offered in support of the objective test is that, if a subjective standard were applied, the testimony of the plaintiff, as to what he would have hypothetically done, would be the controlling consideration. Thus, proof of causation, under a subjective standard, would ultimately turn on the credibility of the hindsight of a person seeking recovery after he had experienced a most undesirable result. Such a test puts the physician in jeopardy of the patient's hindsight and bitterness. In the case at hand *the patient's credibility is not an issue and could not be questioned. She has already stated under oath that, even if she had been informed of all of the alternatives and all of the consequences, she would still have made the election which she made.* This is a drastic statement against interests and the credibility is beyond question.

(Emphasis added.) *Misel* at *3, citing *Sard* at 449.

**{¶ 58}** Here, as in *Misel,* there is no credibility issue. Matthew's statement that he did not know his rights at the time he signed the release is irrelevant in light of his admission that he would have signed the release even if he had been informed of the consequences.

{¶ 59} Accordingly, the trial court did not err in granting summary judgment in favor of Appellees with respect to Matthew's claims.

B. Joshua Tye

{¶ 60} In ruling on summary judgment, the trial court first rejected Appellees' argument that Joshua could file a motion for relief from judgment in the medical malpractice case because he was incompetent to sign the release. In the court's view, Beausay's neglect would be imputed to Joshua and would preclude the claim for relief. The trial court further concluded, however, that Phares could not establish proximate cause for two reasons. First, Phares was unable to say that she would not have signed the releases or would have sought legal counsel. Order on Proximate Cause at p. 9. Additionally, the court found "Matthew's testimony compelling on this point as well in that the main focus of the family at the time the releases were signed was getting Scott Tye the money he needed to care for himself at the time." *Id.* The court was further persuaded by the fact that Joshua is incompetent and that Phares was appointed as his guardian in 2015. *Id.* at p. 9-10.

{¶ 61} As noted, we review the court's summary judgment decision de novo. *GNFH, Inc.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, at ¶ 16. According to Appellants, Phares's testimony was irrelevant because she was not Joshua's guardian when he signed the release. Appellants also argue that the trial court erred in imputing Matthew's testimony to Phares.

{¶ 62} In response, Appellees contend that summary judgment was appropriate because Joshua had the burden of establishing that it was more likely than not that the

release would not have been signed. Because there was no evidence of that, including Phares's testimony, Appellees argue that "a complete lack of evidence does not get [Appellants] past 50%." Appellees' Brief, p. 22.

{¶ 63} The facts pertaining to Joshua's claim are more complex than those involving Matthew. Joshua is Matthew's twin brother, and he has cerebral palsy and is intellectually disabled. Beausay was well aware of these facts when he settled the medical malpractice case at mediation. *See* July 20, 2012 Beausay letter confirming the mediation set for July 21, 2012; Beausay Depo. p. 28.[3] At the time, Joshua did not have a guardian, but his mother, Phares, had a financial and medical power of attorney. Phares Depo. (Vol. 2) p. 58.

{¶ 64} Phares was unaware of the settlement and only knew after the fact that Matthew and Joshua had signed some things. Phares Depo. (Vol. 1) p. 27. When Phares asked Matthew what had been signed, he just said, "Stuff for dad," and did not tell her anything else. *Id.* at p. 32. After Scott Tye died in October 2014, Phares found out what her adult children had signed and that they had been parties in litigation. *Id.* at p. 35-36. She then consulted a lawyer in 2015. *Id.* at p. 36. In 2015, Phares was also appointed guardian for Joshua; there had been no prior determination that he was unable to care for himself. *Id.* at p. 10. Both boys were emancipated when they were 19, and Phares did not challenge the emancipation. *Id.* at 11.

{¶ 65} During her February 2019 deposition, Phares was asked a number of

---

[3] The letter was identified in Beausay's Deposition as Exhibit 3 and was attached as Exhibit A to the November 11, 2015 reply memorandum, which Appellants filed in support of their motion to file an amended complaint in Montgomery C.P. No. 15-CV-4852. We ordered that the filings in that case be transferred to this case. *See* Decision and Entry (July 15, 2019), 2d Dist. Montgomery No. 28383, p. 1.

hypothetical questions about what she would have done had she known that Joshua was a party to litigation and that a settlement had been reached in 2012. First, the following exchange occurred:

> Q. Well, let me ask you a couple of hypotheticals. If Scott said, hey we need to talk to Jodi [Phares] about this and then Jeff [Beausay] called you and said, hey look, Joshua is a plaintiff in this case, he may or may not be able to recover for a consortium claim, I'm not sure if it has any value or not, do you want me to pursue that, what would you have said?
>
> * * *
>
> THE WITNESS: Hypothetically, I don't know what I would have said. I don't know.

Phares Depo. (Vol. 2) p. 62.

{¶ 66} This exchange then took place:

> Q. So let's assume that you get a call from Jeff [Beausay], who tells you hey, Scott told me to call you. I have preserved Josh's claims in this lawsuit, and he has these claims. They may have some value; I'm not sure. There is a settlement offer on the table. He needs to release his claims for this money to go to Scott. What would you say?
>
> A. Again, I have no idea what I would say. I don't know what I would have done. I have no idea. You're speaking very hypothetically.
>
> Q. I understand. And I'm just trying to figure out if there is somewhere this is going to go, where it's going to end up where I think it is – but that was just babble, me just saying something for no good reason.

A.   Okay.

Q.   It was.

Phares Depo. (Vol. 2) p. 63.

{¶ 67} The hypothetical questions continued, ending with the following exchange:

Q.   If you had found out that Matthew and Joshua were going up to sign these releases and they weren't getting any money, what would you have done?

A.   I don't know. I really – I don't know if I would have had a conversation with Scott, like can we talk about this.   I don't know if I would have sought counsel, I have no idea what I would have done.

Phares Depo. (Vol. 2) p. 63-64.

{¶ 68} Joshua was not asked about these matters during his July 22, 2016 deposition, and Appellees failed to submit any information on this issue when they moved for summary judgment on the proximate question issue.   Appellants also did not file any affidavits with respect to this issue.

{¶ 69} As a preliminary point, the trial court's reliance on Matthew's testimony as proof of the "family's" intent that Scott Tye solely benefit from the settlement was both factually and logically unwarranted.   The record was replete with evidence that Scott had not adequately assisted in financially supporting his children in the past, that friction had existed because of it, and that Phares, as Scott's ex-wife, would have been more interested in making sure that her children, particularly Joshua, were protected than she was about Scott.   *See* Phares Depo. (Vol. 1) p. 11, 13-14, 27-28, 49, and 50; Phares Depo. (Vol. 2) p. 59-60.

**{¶ 70}** For example, the following exchange occurred during Phares's second deposition:

> Q.  But he [Scott] never gave you a chunk of money to take care of Joshua?
>
> A.  No.  It was always in our conversations I will take care of Joshua.  I don't want Joshua to be in a home.  Those were always our – as parents of a disabled child, those are – I think that's your worst nightmare is who is going to take care of Joshua when you're no longer here to do it and is he going to have a good quality of life.  And I think Scott shared that concern as I did.  That's the basis of any disabled person's parent's plight.

Phares Depo. (Vol. 2) p. 64-65.

**{¶ 71}** Given these facts, a logical inference would have been that Phares would have asserted herself and would have taken action to protect Joshua had she known about the proposed settlement.  In view of Phares's subsequent answers to what she clearly considered speculative questions, a genuine issue of material fact existed concerning what she may have done.  The issue must be resolved by a jury.

**{¶ 72}** As a further point, Appellees misconstrue the burden of proof on summary judgment.  The case they cite for the proposition that Phares had the burden of proving causation by a preponderance of evidence, or by more than 50%, was not a summary judgment case.  Instead, it was a case in which liability for medical malpractice had been tried to the court.  *See Rosenshine v. Med. College Hosps.*, 2012-Ohio-2864, 974 N.E.2d 692, ¶ 10 (10th Dist.).  The standard for summary judgment is that "if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined

in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial."
*Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996).

**{¶ 73}** To the extent that Appellees satisfied their initial burden by setting forth purely speculative answers (which is doubtful), the facts in the record indicate that genuine issues of material fact existed regarding the claim brought by Phares on Joshua's behalf.   Accordingly, the trial court erred in rendering summary judgment in Appellees' favor on this point.

**{¶ 74}** Based on the preceding discussion, the First Assignment of Error is sustained in part and overruled in part.

### III.   Respondeat Superior

**{¶ 75}** Appellants' Second Assignment of Error states:

The Trial Court Erred in Granting Summary Judgment on the Respondeat Superior Claim.

**{¶ 76}** Under this assignment of error, Appellants contend that the trial court erred in applying an "independent contractor" status to Beausay in deciding whether the Donahey Law Firm was entitled to summary judgment, because such a test is unsupported by Prof.Cond.R. 7.5(d) and Comment 2 to that rule.   In response, Appellees argue that the Appellants cannot challenge the trial court's decision on appeal because Appellants failed to respond to the firm's summary judgment motion.   According to Appellants, their arguments may still be considered as plain error, and plain error occurred.

**{¶ 77}** As Appellants concede in their reply brief, we have held that "[a]ny error

committed by the trial court in granting summary judgment is waived if the non-moving party fails to file a brief or evidence in opposition or fails to challenge the movant's evidence." *USA Freight, L.L.C. v. CBS Outdoor Group, Inc.*, 2d Dist. Montgomery No. 26425, 2015-Ohio-1474, ¶ 21, citing *Rodger v. McDonald's Restaurants of Ohio, Inc.*, 8 Ohio App.3d 256, 258, 456 N.E.2d 1262, fn. 7 (8th Dist.1982). In such situations, we review only for plain error. *Id.* *See also Hunk v. Moody*, 2d Dist. Montgomery No. 22015, 2008-Ohio-988, ¶ 33 (a summary judgment issue not raised in the trial court is forfeited on appeal and is considered under plain error); *Community Mut. Ins. Co. v. Johnson*, 2d Dist. Montgomery No. 13205, 1992 WL 235706, *2 (Sept. 22, 1992); *U.S. Bank, N.A. v. Goldsmith*, 10th Dist. Franklin No. 14AP-783, 2015-Ohio-3008, ¶ 7 (applying plain error where appellant failed to file a memorandum opposing summary judgment).

**{¶ 78}** "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), syllabus.

**{¶ 79}** In granting summary judgment to the Donahey Law Firm, the trial court relied on the independent contractor test. The court's decision was based on the fact that the law firm did not retain the right to control the manner or means of Beausay's work and only retained control over the results of the work. Order on Respondeat Superior, p. 4.

{¶ 80} " 'Respondeat superior' speaks only to the vicarious liability of an employer; it does not simultaneously create an express cause of action against individual agents and servants of the employer. 'Respondeat superior' means '[l]et the *master* answer,' and [has been defined] * * * as the doctrine holding 'a *master* * * * liable in certain cases for the wrongful acts of his servant, and a *principal* for those of his agent.' " (Emphasis sic.) *Hauser v. Dayton Police Dept.*, 140 Ohio St.3d 268, 2014-Ohio-3636, 17 N.E.3d 554, ¶ 11, quoting Black's Law Dictionary 1546 (3d Ed.1933). "This doctrine of liability depends on the existence of control by a principal (or master) over an agent (or servant), terms that have been used interchangeably." *Natl. Union Fire Ins. Co. of Pittsburgh, PA v. Wuerth*, 122 Ohio St.3d 594, 2009-Ohio-3601, 913 N.E.2d 939, ¶ 20.

{¶ 81} In *Wuerth*, the Supreme Court of Ohio commented:

*There is no basis for differentiating between a law firm and any other principal to whom Ohio law would apply.* In fact, the Restatement of the Law 3d, The Law Governing Lawyers (2000) 439-440, Section 58, indicates that a law firm has no vicarious liability unless at least one principal or employee of the firm is liable. Entitled "Vicarious Liability," it provides:

"(1) A law firm is subject to civil liability for injury legally caused to a person by any wrongful act or omission of any principal or employee of the firm who was acting in the ordinary course of the firm's business or with actual or apparent authority." * * *

(Emphasis added.) *Id.* at ¶ 24-25.

{¶ 82} Given the above emphasized comment, there is no basis for departing from typical principles relating to respondeat superior. In arguing that the concept of

"independent contractor" should not be employed in cases involving law firms, Appellants refer, as noted, to Prof.Cond.R. 7.5(d) and Comment 2 to the rule.

{¶ 83} Prof.Cond.R. 7.5(d) states that "Lawyers may state or imply that they practice in a partnership or other organization only when that is the fact." Comment 2 to the rule further says that:

>  With regard to division (d), lawyers sharing office facilities, but who are not in fact associated with each other in a law firm, may not denominate themselves as, for example, "Smith and Jones," for that title suggests that they are practicing law together in a firm. The use of a disclaimer such as "not a partnership" or "an association of sole practitioners" does not render the name or designation permissible.

{¶ 84} Violating this rule can lead to disciplinary proceedings and sanctions. *See Cincinnati Bar Assn. v. Hoskins*, 149 Ohio St.3d 645, 2016-Ohio-4576, 77 N.E.3d 899, ¶ 29; *Disciplinary Counsel v. Conese*, 102 Ohio St.3d 439, 2004-Ohio-3888, 812 N.E.2d 944, ¶ 4. However, this does not mean that lawyers cannot practice as independent contractors or that different rules for lawyers should apply. *Wuerth*, 122 Ohio St.3d 594, 2009-Ohio-3601, 913 N.E.2d 939, at ¶ 24. Lawyers should be judged by relationship principles that pertain to all other employees and employers.

{¶ 85} " 'The chief test in determining whether one is an employee or an independent contractor is the right to control the manner or means of performing the work.' " *State ex rel. Nese v. State Teachers Retirement Bd. of Ohio*, 136 Ohio St.3d 103, 2013-Ohio-1777, 991 N.E.2d 218, ¶ 33, quoting *Bobik v. Indus. Comm.*, 146 Ohio St. 187, 64 N.E.2d 829 (1946), paragraph one of the syllabus. On the "continuum of

control, * * * ' "[t]he control of the work reserved in the employer which effects a master-servant relationship is control of the means and manner of performance of the work, as well as of the result; an independent contractor relationship exists where the person doing the work is subject to the will of the employer only as to the result, but not as to the means or manner of accomplishment." ' "  *Id.* at ¶ 34, quoting *Gillum v. Indus. Comm.*, 141 Ohio St. 373, 382-383, 48 N.E.2d 234 (1943).   (Other citation omitted.)

**{¶ 86}** Courts look at a case's individual facts to decide who has the right to control the work. " 'The factors to be considered include, but are certainly not limited to, such indicia as who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who selects the routes travelled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts.' "  *Nese* at ¶ 35, quoting *Bostic v. Connor*, 37 Ohio St.3d 144, 146, 524 N.E.2d 881 (1988).

**{¶ 87}** In the case before us, the law firm's motion for summary judgment was supported by Beausay's affidavit, which was attached as Exhibit A.   In the affidavit, Beausay stated that he had been practicing law since 1987, had joined the Donahey Firm as an independent contractor in 2001, and had separated from the firm in 2018. Beausay Aff., ¶ 1 and 3.   Beausay further stated that he was never a W-2 employee, that he worked independently from other attorneys in the firm, and that he paid for his own health insurance, malpractice insurance, office supplies, and furniture.   *Id.* at ¶ 4 and 5. Beausay also said that he never received a salary but was compensated on a contingency basis from settlements and verdicts obtained.   *Id.* at ¶ 7.

**{¶ 88}** No evidence was offered to rebut these statements, and the trial court did

not err in finding no genuine issue of material fact concerning whether the Donahey Law Firm controlled the means and manner of Beausay's work.

{¶ 89} In *Wuerth*, the Supreme Court of Ohio indicated that law firms may also be liable for injury caused by a principal or employee who is acting "with actual or apparent authority." *Wuerth*, 122 Ohio St.3d 594, 2009-Ohio-3601, 913 N.E.2d 939, at ¶ 25. This is the context in which Beausay's use of the Donahey Law Firms' letterhead could be of potential relevance. Specifically, Appellants rely on a letter that was attached to their reply memorandum in support of their request to file an amended complaint. This letter, which was dated June 20, 2012, concerned the July 21, 2012 mediation scheduled in the underlying medical malpractice case. The letterhead bore the name of the Donahey Law Firm. It also listed the firm's Columbus phone number and listed Beausay's email address as "tjbeausay@donahey.law.com." Plaintiffs' November 11, 2015 Reply Memorandum in Support of Their Motion to File First Amended Complaint, Ex. 1, p. 1 (Montgomery C.P. No. 15-CV-4852).

{¶ 90} No further information was submitted about the circumstances of the letterhead's use. Beausay also stated in his deposition that, in addition to his nephew, Jacob Beausay, other lawyers at his firm who participated in the case included his partner, Mark Defossez, who appeared at the mediation with him. Beausay Depo. p. 35-36. According to Beausay, he and Defossez often joined each other at mediations. *Id.* at p. 36. In addition, Beausay's wife, Melanie, who was a paralegal at the law firm, worked on the case. *Id.*[4]

---

[4] No information was presented concerning whether Beausay's wife was paid by the Donahey Law Firm or by Beausay.

{¶ 91} "The relationship of principal and agent, and the resultant liability of the principal for the acts of the agent, may be created by the express grant of authority by the principal. Absent express agency, the relation may be one of implied or apparent agency." *Master Consol. Corp. v. BancOhio Natl. Bank*, 61 Ohio St.3d 570, 574, 575 N.E.2d 817 (1991).

{¶ 92} "[I]n order for a principal to be bound by the acts of his agent under the theory of apparent agency, evidence must affirmatively show: ' " * * * (1) [t]hat the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of the facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority. The apparent power of an agent is to be determined by the act[s] of the principal and not by the acts of the agent; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of the authority and not where the agent's own conduct has created the apparent authority. * * * " ' " *Id*. at 576-577, quoting *Logsdon v. ABCO Constr. Co.*, 103 Ohio App. 233, 241-242, 141 N.E.2d 216 (2d Dist.1956). (Other citations omitted.) *Accord Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 56.

{¶ 93} Apparent authority " 'can be expressly created by the principal's written or spoken words, or by his conduct which, reasonably interpreted, causes a third person to believe that he consents to the agency relationship.' " *Natl. City Bank v. Rhoades,* 150 Ohio App.3d 75, 2002-Ohio-6083, 779 N.E.2d 799, ¶ 18, quoting *Lovely v. Cty. Fed. Credit Union*, No. CV-91-148 (Feb. 25, 1992 Me. Super). "The burden of proving [that

apparent authority] exists rests upon the party asserting the agency." *Irving Leasing Corp. v. M & H Tire Co.*, 16 Ohio App.3d 191, 475 N.E.2d 127 (2d Dist.1984).

**{¶ 94}** The evidence concerning apparent authority here was virtually non-existent. Beausay was not questioned about the letterhead or the email address, and there was simply no evidence about any actions of the law firm. Compare *McFarland v. Niekamp, Weisensell, Mutersbaugh & Mastrantonio, LLP*, 9th Dist. Summit No. 28462, 2017-Ohio-8394, ¶ 22-27 (listing many ways in which a law firm appeared to have given an attorney apparent authority. As just one example, the law firm in that case had a website advertising its legal services, and listed the names and pictures of the attorneys the firm employed.)

**{¶ 95}** Notably, the "letterhead" on Ex. 1, unlike most firm letterheads, did not list any other firm members; only Beausay's name appeared. The most logical conclusion is that this was something Beausay, himself, prepared. There was certainly no evidence that the Donahey Law Firm prepared the letterhead or provided it to Beausay.

**{¶ 96}** As an additional point, there was no way Appellants could have believed that Beausay had authority as the law firm's agent. Appellants never met Beausay and had no dealings with him.

**{¶ 97}** For the reasons discussed, we agree with the trial court that no genuine issue of material fact existed concerning Donahey Law Firm's liability as an employer for Beausay's wrongful actions. There was no error, let alone plain error. Accordingly, the Second Assignment of Error is overruled.

IV.   Conclusion

{¶ 98} Appellants' First Assignment of Error having been overruled in part and sustained in part, and their Second Assignment of Error having been overruled, the judgment of the trial court is reversed in part and affirmed in part. This cause is remanded to the trial court for further proceedings.

. . . . . . . . . . . .

HALL, J., concurs:

{¶ 99} As a result of the majority opinion, the only remaining claim is that of Joshua Tye, presented for him by his guardian Phares, against attorney Beausay individually and not against the Donahey Law Firm.

{¶ 100} The dissent concludes that there was a genuine issue of material fact whether the Donahey Law Firm's representation of Scott Tye, Joshua's father, continued through mediation and settlement and, therefore, whether the law firm might be held responsible for Beausay's actions on the basis of respondeat superior in that Beausay could be found to have been acting by actual or apparent authority of the law firm.

{¶ 101} I write separately to emphasize there is no question as to the facts that matter in regard to Joshua, and there is no question that the Firm cannot be held liable with regard to the legal theory on which we previously held Beausay could be held liable, or on the basis that Beausay was acting with apparent authority of the firm.

{¶ 102} In our previous opinion, *Tye I*, 2017-Ohio-7943, 98 N.E.3d 970, we concluded there was no express or implied attorney-client relationship between Joshua Tye and Beausay. *Id.* at ¶ 10. They had no contact with each other, although Beausay

named Joshua as a plaintiff in litigation concerning Joshua's father's medical treatment. Without an attorney-client relationship, potential liability of Beausay existed, we said, because "filing, pursuing, mediating, settling and dismissing a lawsuit is collectively sufficient extra-legal activity to constitute an exception to the attorney-client relationship." *Id*. at ¶ 18. Viewing the evidence and all reasonable inferences in a light most favorable to the Tye brothers, we found a genuine issue of material fact as to whether Beausay acted with "malice" (i.e., extra-legal activity) so as to substitute for an attorney-client relationship. *Id.* We did not deal with the respondeat superior claim against the law firm in that decision.

{¶ 103} The Donahey Law Firm's potential liability is more complicated than whether Beausay was an employee or whether he acted with apparent authority. Ordinarily an employer is liable for the acts of its employees. "[F]or an employer to be liable under the doctrine of respondeat superior, the tort of the employee must be committed within the scope of employment." *Byrd v. Faber*, 57 Ohio St.3d 56, 58, 565 N.E.2d 584 (1991). In the very narrow manner in which malice may substitute for the missing attorney-client relationship for Beausay's liability, that notion should likewise apply to the firm. Even though there was no evidence Beausay was an employee, even if there had been, there was no evidence whatsoever that the law firm also acted with the "malice" (i.e., extra-legal activity) that exposed Beausay to potential liability. There was no evidence that the "extra-legal activity" was within the scope of Beausay's employment, no evidence that the law firm ratified the "extra-legal activity," and no evidence to conclude the activity was actually authorized by the firm. There was every reason to infer the "malice" was not within the scope, not ratified, and not authorized. Therefore, there were

no facts or reasoning to support liability of the law firm on the basis of a traditional respondeat superior principles or an actual agency relationship. Thus, the grant of summary judgment to the law firm is properly affirmed.

{¶ 104} The dissent's suggestion that perhaps Beausay acted with apparent authority of the law firm regarding Joshua Tye likewise has no factual support. Whether Scott Tye and his wife consulted the law firm was wholly irrelevant in regard to the claim of Joshua, who never consulted Beausay or the firm; Joshua never communicated whatsoever with either of them. There was no evidence the firm ever communicated with or to Joshua.

{¶ 105} The general rule is that an employer is vicariously liable for the torts of its employees or agents, but not for the negligence of an independent contractor. An exception to this rule was carved out as an agency-by-estoppel theory regarding medical negligence in *Albain v. Flower Hosp.*, 50 Ohio St.3d 251, 553 N.E.2d 1038 (1990). In *Albain*, it was held that if a hospital makes representations that reasonably lead a patient to believe a physician is acting as an agent for a hospital *and* a patient is thereby reasonably induced to rely on those representations, then the principal, the hospital, can be held vicariously liable for the physician's negligence even though the physician was an independent contractor. *Albain* was later modified by *Clark v. Southview Hosp. & Family Health Ctr.*, 68 Ohio St.3d 435, 628 N.E.2d 46 (1994), which held:

> A hospital may be liable under the doctrine of agency by estoppel for the negligence of independent medical practitioners practicing in the hospital when: (1) it holds itself out to the public as a provider of medical services; and (2) in the absence of notice or knowledge to the contrary, the

patient looks to the hospital, as opposed to the individual practitioner, to provide competent medical care.

*Id.* at syllabus.

{¶ 106} There is no definitive holding that applies agency by estoppel to impose liability upon a law firm for the acts of an independent-contractor lawyer, but there was much discussion about law-firm liability and agency by estoppel in *Wuerth,* 122 Ohio St. 3d 594, 2009-Ohio-3601, 913 N.E.2d 939. In that case, which involved a legal-malpractice question certified from the U.S. Sixth Circuit Court of Appeals, the Ohio Supreme Court's holding was that a law firm could not be held vicariously liable for activity of its partner, Wuerth, when Wuerth could no longer be held liable because the statute of limitation had expired as to him. However, the discussion of vicarious liability was emphatic enough to lead to the conclusion that the agency-by-estoppel analysis that applies to hospitals and doctors likewise applies to law firms and their lawyers.

{¶ 107} The problem here is that there was absolutely no evidence that the Donahey Law Firm represented anything to Joshua or had any contact with him at all. Just as importantly, there was no evidence whatsoever that Joshua relied on, looked to, or was even aware that the lawyer representing his father had any connection with a law firm. Because there was no representation to Joshua to support a belief of "apparent authority" and no evidence Joshua relied on any kind of representation, there was no possible issue as to "apparent authority" (agency by estoppel) that could survive summary judgment.

{¶ 108} I concur in the reversal of summary judgment with regard to Joshua Tye's claim against attorney Beausay, and I concur in the affirmance of the remainder of the

trial court's judgment that is on appeal.

FROELICH, J., concurs in part and dissents in part:

{¶ 109} I concur in the affirmance of the summary judgment against Matthew Tye and the reversal of the summary judgment against Phares as to their claims against Beausay.   I dissent from the affirmance of the summary judgment in favor of the Donahey Law Firm based on respondeat superior as to Phares's claims against the law firm.

{¶ 110} Appellants' failure to respond to the firm's motion for summary judgment or the applicability of plain error is not controlling.   Rather, since we use a de novo standard of review, the question is whether the Civ.R. 56 evidence presented a genuine issue of material fact regarding potential respondeat superior liability of the law firm.   I would find that it does.

{¶ 111} In seeking summary judgment in this case, the Donahey Law Firm presented a seven-sentence affidavit by Beausay in which he indicated that he was an independent contractor.   *See* Donahey Motion for Summary Judgment (Jan. 25, 2019). Beausay stated that he was hired as an independent contractor, worked on a contingency basis and did not receive a salary, received a Form 1099 rather than a W-2, worked independently from other attorneys, and performed most of his work at home.   In addition, he indicated that he paid his own "professional liability insurance, health insurance, office furniture, office supplies, etc."

{¶ 112} However, in our previous opinion, we noted that "Scott and Barbara Tye were represented by Attorney Beausay *and the Donahey Law Firm* in the lawsuit" [5] and

_____

[5] This statement refers to the medical malpractice suit, *Tye v. Upper Valley Med. Ctr.,*

that Matthew and Joshua Tye "were also named by Beausay as plaintiffs." (Emphasis added.) *Tye I*, 2d Dist. Montgomery No. 27416, 2017-Ohio-7943, at ¶ 3. We concluded that, at least, there was "a genuine issue of material fact as to whether Beausay acted with 'malice' * * *." *Id.* at ¶ 18.

{¶ 113} Beausay's prior affidavit, sworn on March 28, 2016, stated that Beausay "was a defense attorney representing mostly insurance companies until June 2001, at which time [he] joined [his] current law firm mostly representing plaintiffs." Beausay further stated that "Scott and Barbara Tye consulted *The Donahey Law Firm* regarding a potential medical negligence matter," and they subsequently signed a fee agreement. (Emphasis added.) Beausay referred to the Tyes' consultation as being with "our firm."

{¶ 114} The original medical malpractice suit, the eventual settlement of which is the subject of the case now before us, was filed on November 29, 2010. The complaint was signed by Beausay above a signature block that read:

> T. Jeffrey Beausay (39436)
> Jacob J. Beausay (85213)
> The Donahey Law Firm
> 495 South High Street, Suite 300
> Columbus, Ohio 43215
> 614.224.8166/614.849.0475 (fax)
> **tjbeausay@donaheylaw.com**
> Trial Attorneys for Plaintiffs

(Bold sic.) Subsequent filings in that case by Beausay had nearly identical signature blocks.[6] Reciprocally, the filings of the defendants certified service to Beausay at the

_____

Montgomery C.P. No. 2010-CV-9282.

[6] In some filings, the name of the firm, rather than Beausay's email address, was in bold. In others, none of the signature block was bolded. In addition, beginning 2012, the

law firm's address. Likewise, when the court listed an address on its orders and judgments, it served its orders and judgments to Beausay at the Donahey Law Firm.

**{¶ 115}** Prior to the mediation at which the case was settled, Beausay sent correspondence, dated July 20, 2012, to the mediator on firm letterhead. (*See* Beausay Depo., Ex. 3). The letter had "The Donahey Law Firm" in a large font at the header (left justified) with Beausay's contact information at the firm in smaller font below that (right justified); the firm's name, address, phone numbers, and fax number were listed in the footer. The Confidential Release of Claims signed by Matthew Tye and Joshua Tye was faxed to "The Donahey Law Firm" in October 2014 at the fax number identified in the above signature block and the letterhead. (*See* Motion for Summary Judgment {Oct. 11, 2016), Ex. A4.)

**{¶ 116}** Beausay's affidavit in support of the law firm's motion for summary judgment in this case, viewed alone, may support a conclusion that he was an independent contractor with no actual authority with respect to the firm. However, his prior affidavit suggested that he met with Scott and Barbara Tye as a representative of the Donahey Law Firm and that he had the ability to enter into an engagement agreement for the law firm and to represent the Tyes on behalf of the firm. Accordingly, I would conclude that a genuine issue of material fact existed as to Beausay's status with the firm and, consequently, as to Beausay's actual authority to act on behalf of the firm.

**{¶ 117}** Even assuming that no genuine issue of material fact existed regarding actual authority, liability could attach through apparent authority, and nothing in Beausay's seven-sentence affidavit addresses apparent authority. By all outward appearances,

---

signature block excluded Jacob Beausay as co-counsel.

Beausay's actions in the original malpractice case were taken on behalf of the firm. Beausay's signature block on all of his court filings, his use of firm letterhead, and his sworn statements regarding how he came to represent Scott and Barbara Tye all suggest an agency relationship.

{¶ 118} Attorneys can practice law in various "settings," including, for example, as solo practitioners, partnerships, limited liability partnerships, non-equity partnerships, corporations, limited liability corporations, professional corporations, of counsel, equity partnerships, space-sharing, associates, employees, special counsel, independent contractors, virtual law firms, and more. Whether a lay person can be expected to appreciate such distinctions is, at least, a question of fact, particularly when an arrangement permits an attorney to present himself or herself as acting on behalf of a law firm.

{¶ 119} In summary, as we held in *Tye I*, 2d Dist. Montgomery No. 27416, 2017-Ohio-7943, Beausay and the Donahey Law Firm represented Scott Tye and his wife, *id.* at ¶ 3, and there is, at least, a genuine issue of material fact whether that representation (actual or apparent) continued through the mediation and settlement.

Copies sent to:

Terry W. Posey, Jr.
Gary W. Gottschlich
Nicholas E. Bunch
Gregory B. Foliano
John B. Welch
Hon. Dennis J. Adkins